496 So.2d 789 (1986)
SHELL OIL COMPANY, Petitioner,
v.
DEPARTMENT OF REVENUE, Respondent.
Nos. 66240, 66254.
Supreme Court of Florida.
April 24, 1986.
Rehearing Denied November 24, 1986.
Arthur J. England, Jr. and Sandra S. Barker of Fine Jacobson, Schwartz, Nash, Block and England, Miami, and William D. Peltz, Senior Tax Counsel and Elizabeth C. Burton, Tax Atty., Shell Oil Co., Houston, Tex., for petitioner.
Jim Smith, Atty. Gen., and Joseph C. Mellichamp, III, and Sharon A. Zahner, Asst. Attys. Gen., Tallahassee, for respondent.
McDONALD, Justice.
The First District Court of Appeal has certified the following question as one of great public importance:
Whether the State of Florida is prohibited by U.S.C. § 1333(a)(2)(A) [sic] from imposing a tax upon income derived from the sale in the United States of oil extracted from the outer Continental Shelf?
Shell Oil Co. v. Department of Revenue, 461 So.2d 959, 963 (Fla. 1st DCA 1984).[1] This Court has jurisdiction pursuant to article V, section 3(b)(4), Florida Constitution. We answer the certified question in the negative, approving in part and quashing in part the opinion of the district court.
*790 Shell Oil, a Delaware corporation, conducts business throughout the United States. Among its many activities, Shell operates a number of drilling platforms for the extraction of crude oil and natural gas from the outer continental shelf (OCS). Shell makes all transfers of OCS natural gas by sale to nonaffiliated independent pipeline companies that rent space on Shell's platforms. In the case of crude oil, Shell makes some transfers by sale to independent third parties, but Shell delivers most of the oil to its own pipeline for transport to shore. Shell treats all transfers, whether to third parties or to the pipeline, as taxable events for federal income tax purposes. Shell, however, excludes such earnings from its taxable income for Florida income tax purposes. The company determines the revenue which the transfers generate based on the fair market value of crude oil at the wellhead less related expenses. Most of the oil extracted from the OCS wells is refined and sold in the United States.
The Florida Department of Revenue (DOR) disallowed Shell's exclusion of certain OCS production income from its Florida tax base for fiscal years 1972-75. The trial court agreed with DOR as to the exclusion. The court, however, ruled that Shell could include its intangible drilling costs (IDCs) in the property factor of Florida's tax apportionment formula. Both parties appealed, and the district court affirmed the trial court as to both issues. On rehearing, however, the district court certified the instant question to this Court. Following certification, both parties independently petitioned this Court for review. These petitions have been consolidated for purposes of the case at bar.
Section 1333(a)(2) of the Outer Continental Shelf Lands Act states that state taxation laws shall not apply to the outer continental shelf. 43 U.S.C. § 1333(a)(2) (1970). Neither DOR nor Shell Oil disputes this, and both parties agree that the oil production in question is derived from the OCS. Further, DOR concedes that any revenues which Shell derives from actual sales consummated on the OCS oil platforms are beyond the reach of Florida's taxing power as limited by section 1333(a)(2). Accordingly, the dispute concerns only the income derived from sales of OCS oil actually made within the boundaries of the fifty states.
DOR contends that because Shell sold the oil within the boundaries of the fifty states, and not on the OCS, the taxable event occurred within the reach of Florida's tax laws. On the other hand, Shell contends that the time and location of the actual sale are irrelevant because no sale of OCS production can ever be subject to state taxation. Shell claims that section 1333(a)(3) of the Outer Continental Shelf Lands Act supports this contention. Section 1333(a)(3) reads:
The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom.
We find that Shell's reliance on section 1333(a)(3) is misplaced. Although section 1333(a)(3) prevents states from claiming an interest in or jurisdiction over the revenues derived from OCS natural resources, the language of this subsection when read in conjunction with the rest of section 1333(a) simply constitutes a limitation of state authority over the OCS area and does not seem intended to address income derived outside the OCS.[2]
Income is normally taxed when realized. Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); § 220.02(4)(a), Fla. Stat. (Supp. 1972). Realization occurs when a taxpayer receives actual economic *791 gain from the disposition of property. Helvering, 311 U.S. at 115, 61 S.Ct. at 146; S.R.G. Corp. v. Department of Revenue, 365 So.2d 687 (Fla. 1978); Heftler Construction Co. v. Florida Department of Revenue, 438 So.2d 139 (Fla. 3d DCA 1983), review denied, 449 So.2d 264 (Fla. 1984). In the case at bar, this realization occurred at the time of sale. Clearly, no realization of income occurred at the wellhead, despite Shell's assignment of an artificial wellhead price to the oil, because Shell received no actual economic gain from any "sale, exchange, or other disposition of property" at that point. § 220.02(4)(a). Rather, realization occurred at the time Shell sold the oil in the states because only at that time did Shell derive any actual economic gain.
Shell insists that all OCS production should be excepted from the general rule that the time of realization is the proper time for judging the taxable nature of income. Yet the cases Shell cites for the proposition that the instant transactions lie beyond the taxable reach of DOR are distinguishable. In both Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), and James v. Dravco Construction Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), the income was realized beyond the respective state's taxing jurisdiction. In the instant case Shell realized the income within the fifty states and both parties agree that Florida can generally levy an apportioned tax on income derived within any of the fifty states. Thus Shell has offered no relevant authority for its claim that OCS production sold in the states should be an exception to the norm. As the district court pointed out, taking Shell's argument to its logical conclusion, no state could impose any kind of tax on any final product which eventually might be derived from OCS production. We join the district court in finding that Congress never intended such a sweeping result when it passed the Outer Continental Shelf Lands Act. Therefore, we approve the district court's opinion as it relates to the certified question, which we answer in the negative.
We find, however, that the district court erred in ruling that expensed IDCs should be added back into Shell's asset base when calculating the property factor of the apportionment formula. IDCs are not inherently capital in nature. Under federal law, Shell had the option of either capitalizing or expensing its IDCs. IRC § 263(a) & (c) (1954); Treas.Reg. 1.612-4 (1965). Shell elected to expense them for federal income tax purposes, thereby deducting the IDCs from its taxable income base. Section 220.42(1), Florida Statutes (Supp. 1972), requires that a taxpayer's method of accounting for purposes of the Florida Income Tax Code be the same as the taxpayer's method of accounting used for federal income tax purposes. Accordingly, Shell expensed its IDCs on its Florida income tax return.
IDCs occupy a special tax category, offering an incentive to oil and gas exploration and production. Exxon Corp. v. United States, 37 A.F.T.R.2d (P-H) 76-730, 547 F.2d 548 (Ct.Cl. 1976); Atlantic Richfield Co. v. Department of Revenue, 9 Or.T.R. 451 (1984). Care must be taken, however, not to extend the obvious benefits of this special treatment beyond its intended boundaries. Exxon Corp., 37 A.F.T.R.2d (P-H) at 76-736, 547 F.2d 548; Atlantic Richfield Co., 9 Or.T.R. at 453-54.
Under the Uniform Division of Income for State Purposes Act (UDITPA), which Florida has adopted, a given state determines its apportioned share of a multistate corporation's taxable income on the basis of a three-factor formula composed of sales, payroll, and property. § 214.70-.73 & 220.15(4), Fla. Stat. (1973). Although Shell expensed its IDCs from its taxable income base, it added the IDCs back into its asset base for purposes of calculating the property factor. Federal tax regulations expressly provide, however, that, in the case of oil and gas wells, no adjustment to basis shall be made with respect to IDCs allowable as a deduction in computing net or taxable income. Treas.Reg. § 1.1016-2(a) (1957). Moreover, under Florida law, *792 property is to be valued at "original cost" for purposes of inclusion in the property factor of the apportionment formula. Fla. Admin. Code Rule 12C-1.15(4)(b)(5). Rule 12C-1.15(4)(b)(5) defines "original cost" as the basis of the property for federal income tax purposes at the time of acquisition plus any subsequent capital additions or improvements and less any partial dispositions by sale, exchange, or abandonment. Accordingly, because Shell elected to expense its IDCs and thereby voluntarily subjected itself to the restrictions of treasury regulation section 1.1016-2(a), the Florida Administrative Code bound Shell to the same election for Florida purposes. This ruling is consistent with the results reached by the vast majority of other states operating under the UDITPA. Atlantic Richfield Co., 9 Or.T.R. at 455; Appeal of Pauley Petroleum, Inc., [1982] California Tax Reports (CCH) § 400-101. In addition to ignoring rule 12C-1.15(4)(b)(5), the district court erred in disregarding the clear mandate of section 220.42(1), Florida Statutes (Supp. 1972), which requires a taxpayer's accounting method for Florida tax purposes be the same as the method used for federal income tax purposes. Although DOR failed to bring this statute to the trial court's attention, a reviewing court must follow controlling statutes no matter what omissions may have occurred at trial. Bendenbaugh v. Adams, 88 So.2d 765 (Fla. 1956); City of Lakeland v. Select Tenures, Inc., 129 Fla. 338, 176 So. 274 (1937); Barnett Bank v. Jacksonville National Bank, 457 So.2d 535 (Fla. 1st DCA 1984); § 90.201, Fla. Stat. (1983).
Accordingly, we answer the certified question in the negative and approve the opinion of the district court as it relates to the taxation of OCS production income realized within the fifty states. We quash, however, the opinion of the district court as it relates to the inclusion of IDCs in the property factor of Florida's tax apportionment formula and remand for proceedings consistent with this opinion.
It is so ordered.
ADKINS, OVERTON, EHRLICH and BARKETT, JJ., concur.
BOYD, C.J., dissents with an opinion, in which SHAW, J., concurs.
BOYD, Chief Justice, dissenting.
Because I find that Florida's corporate income tax law directly conflicts with federal law specifically prohibiting the application of state taxes to the outer Continental Shelf, I must respectfully dissent from the majority opinion. I conclude that Congress intended to limit state taxation power over revenues generated from drilling on the outer Continental Shelf regardless of where the sale of the oil takes place and that this limitation, by virtue of the Supremacy Clause, article VI, clause 2, of the United States Constitution, takes precedence over the State of Florida's interest in taxing the income derived from such revenues.
Article VI, clause 2, of the United States Constitution provides:
This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.
This provision standing alone has been interpreted as a limitation on the power of the states to tax the United States Government. However, it also recognizes that Congress can expand the immunity from state taxation beyond this constitutional limitation. See United States v. New Mexico, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982); see also, Arizona Public Service Commission v. Snead, 441 U.S. 141, 94 S.Ct. 1629, 60 L.Ed.2d 106 (1979). Whether a federal law preempts a state law depends on whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Maryland v. Louisiana, 451 U.S. 725, 747, 101 S.Ct. *793 2114, 2129, 68 L.Ed.2d 576 (1981), quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed.2d 581 (1941). Preemption analysis should not be controlled by mechanical or absolute conceptions, but rather should require a particularized examination of the relevant state and federal interests. See Ramah Navajo School Board v. Bureau of Revenue of New Mexico, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).
Hence an analysis of this case must begin with the purposes and objectives of the Outer Continental Shelf Lands Act, ch. 345, § 2, 67 Stat. 462 (1953) (codified as amended at 43 U.S.C. §§ 1331 et seq. (1982)), which extended the Constitution and laws of the United States to the Outer Continental Shelf; i.e., that property located beyond the three mile limit of state jurisdiction established by the Submerged Lands Act, ch. 65, Title I, § 2, 67 Stat. 29 (1953) (codified at 43 U.S.C. §§ 1301 et seq. (1982)). Congress originally declared that the policy of the United States was that:
(a) the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter;
(b) this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected.
43 U.S.C. § 1332. Later Congress amended this section to renumber subsections (a) and (b) to (1) and (2) and to add the following subsections (3) thru (6):
(3) the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs;
(4) since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments 
(A) such States and their affected local governments may require assistance in protecting their coastal zones and other affected areas from any temporary or permanent adverse effects of such impacts; and
(B) such States, and through such States, affected local governments, are entitled to an opportunity to participate, to the extent consistent with the national interest, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf;
(5) the rights and responsibilities of all States and, where appropriate, local governments, to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized; and
(6) operations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.
Act of Sept. 18, 1978, Pub.L. 95-372, Title II, § 202, 92 Stat 634 (1978).
Section 1333(a)(1) of the Outer Continental Shelf Lands Act extends federal jurisdiction to all artificial islands and fixed structures erected on the Outer Continental Shelf "to the same extent as if the Outer Continental Shelf were an area of *794 exclusive Federal jurisdiction located within a State." Furthermore Congress also provided:
(2) ... State taxation laws shall not apply to the outer Continental Shelf.
(3) The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom.
43 U.S.C. § 1333.
Section 1334 sets forth the procedures for administering the leasing of the outer Continental Shelf. Under this section the Secretary of Interior is responsible for promulgating rules and regulations determined to be "necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein." This section was amended in 1978 to also provide that the lessee "shall produce any oil or gas, or both, obtained pursuant to an approved development and production plan." 43 U.S.C. § 1334(g)(1)
Section 1337 sets forth the procedures for the bidding of leases on the outer Continental Shelf. Subsection (a)(3) presently authorizes the Secretary of Interior to "promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area." Section 1344 requires the Secretary of Interior to
prepare and periodically revise, and maintain an oil and gas leasing program to implement the policies of this subchapter. The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval.
As can be seen from the above quoted provisions, the major purpose of the outer Continental Shelf Lands Act was to give the federal government exclusive control over the development and production of the mineral resources lying outside the three mile limit. As the United States Supreme Court noted:
The legislative history confirms that the purpose of OCSLA was "to assert the exclusive jurisdiction and control of the Federal Government of the United States over the seabed and subsoil of the outer Continental Shelf, and to provide for the development of its vast mineral resources." S.Rep. No. 411, 83d Cong., 1st Sess., 2 (1953) (hereinafter 1953 S.Rep.). Congress enacted OCSLA in the wake of decisions by this Court that the Federal Government enjoyed sovereignty and ownership of the seabed and subsoil of the Outer Continental Shelf to the exclusion of adjacent States. See United States v. Texas, 339 U.S. 707 [70 S.Ct. 918, 94 L.Ed. 1221] (1950); United States v. Louisiana, 339 U.S. 699 [70 S.Ct. 914, 94 L.Ed. 1216] (1950). See also United States v. California, 332 U.S. 19 [67 S.Ct. 1658, 91 L.Ed. 1889] (1947). See generally Maryland v. Louisiana, 451 U.S. 725, 730 [101 S.Ct. 2114, 2120, 68 L.Ed.2d 576] (1981). Congress chose to retain exclusive federal control of the administration of the Shelf because it underlay the high seas and the assertion of sovereignty there implicated the foreign policies of the Nation. See 1953 S.Rep., at 6. Much of OCSLA provides a federal framework for the granting of leases for exploration and extraction of minerals from the submerged lands of the Shelf. See 43 U.S.C. §§ 1334-1343.
Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 480 n. 7, 101 S.Ct. 2870, 2876 n. 7, 69 L.Ed.2d 784 (1981).
It is a matter of settled law that no state has jurisdiction to tax in an area of exclusive federal jurisdiction located within a state. Ramah Navajo School Board v. Bureau of Revenue of New Mexico, supra; James v. Dravo, 302 U.S. 134, 58 S.Ct. 208, *795 82 L.Ed. 155 (1937). Since Congress extended federal jurisdiction to the outer Continental Shelf "to the same extent" as if it were an area of exclusive federal jurisdiction within a state, this body of settled law applies with equal force to the outer Continental Shelf and effectively prohibits the imposition of any state tax on revenues derived therefrom.
The lack of jurisdiction in a state to tax in areas of exclusive federal jurisdiction applies not only to direct taxes but to indirect taxes as well. In Ramah, the Supreme Court held that federal law preempts a state tax imposed on the gross receipts a non-Indian construction company received for the construction of a school on a reservation. The Court concluded that the federal objectives of educating Indian children outweighed the state's objective of raising revenue. In James v. Dravo, the United States Supreme Court was faced with the question of whether "annual privilege taxes" measured by profits from "business and other activities" could be imposed by West Virginia on a contractor working on government-owned land. The Supreme Court stated that this depended upon "whether the United States has acquired exclusive jurisdiction over the respective sites. Wherever the United States has such jurisdiction the state would have no authority to lay the tax." Id. at 140, 58 S.Ct. at 212.
With respect to the outer Continental Shelf, the United States Supreme Court has expressly stated that a state "has no valid interest in imposing a severance tax on federal OCS land." Maryland v. Louisiana, 451 U.S. at 752 n. 26, 101 S.Ct. at 2132 n. 26. In that case several states filed an original action with the Supreme Court challenging the constitutionality of Louisiana's First-Use Tax. They claimed, among other things, that the tax was in direct conflict with the Outer Continental Shelf Lands Act. Louisiana attempted to "justify the Tax as a means of alleviating the alleged discrimination against Louisiana gas caused by the fact that Louisiana gas must pay the state severance tax while OCS gas does not." Id. In response to this argument the Supreme Court noted that
if correcting the claimed imbalance were the sole justification asserted for the First-Use Tax, there would be grave doubt about the validity of the Tax. The proper fee or charge for drilling for gas on the OCS is a determination which is solely within the province of the Federal Government. Even if the United States were to decide to open up development to all comers at no charge in order to spur development of natural gas, Louisiana would have no interest in overriding that decision by imposing a tax to equalize the cost of local production with that on the federal OCS area. Permitting the States to exercise such power would adversely affect the price which the Government could command from private developers in their bid price. As clearly required by the OCS Act, Louisiana's sovereign interest in the development of offshore mineral interests stops at its 3-mile border.
Id.
The reason why the Supreme Court did not specifically decide to hold that Louisiana's First-Use Tax was in direct conflict with the Outer Continental Shelf Lands Act was because Louisiana also argued that certain environmental interests were being served by the tax. If true, then the tax would not be in direct conflict with the OCSLA because Congress adopted specific provisions allowing the states to retain control over the environmental impact offshore drilling may have in their jurisdictions. Since the First-Use tax applied to oil obtained from sources other than the outer Continental Shelf, resolution of this issue would not have been dispositive of the case and was therefore unnecessary to decide. Thus judicial conservatism, not judicial imprimatur as the majority opinion suggests, was the reason why the Supreme Court did not test the validity of this tax by examining its effect on the OCSLA. From this discussion, it is clear that the Supreme Court intends that the appropriate process for analyzing the preemption question is to *796 examine the relative interests of the state and federal government, and not to decide the matter by using a mechanical or absolute concept as was done in the majority opinion.
The next step in this analysis is to determine whether Florida's Corporate Income Tax Code, chapter 220, Florida Statutes (1985), conflicts with federal governments regulating the production of oil on the outer Continental Shelf. Florida's corporate income tax is a tax on income "at such time as such income is realized for federal income tax purposes." § 220.02(4)(a), Fla. Stat. (1985). The amount of income attributed to being earned in Florida is calculated by the apportionment formula found in chapter 214, Part IV, Florida Statutes (1985). Simply stated, this formula is the sum of three fractions. The numerators of these fractions are the corporations's real and tangible personal property, payroll, and sales within Florida and the respective denominators are the total amounts of the corporation's real and tangible personal property, payroll, and sales in the United States, its territories, and any foreign country.
It is clear that this tax can have a great impact upon the production of oil on the outer Continental Shelf. The higher the tax, the less incentive for companies to explore and produce oil. This could be in direct contravention to the desires of the federal government and could interfere with its sole responsibility to oversee the production and preservation of natural resources contained in the outer Continental Shelf. The impact of this tax does not depend on where the sale of the oil takes place.
It is also clear that the tax is not imposed to further any conservation or environmental goals. For that reason it does not fall within the range of authority Congress specifically delegated to the states under the OCSLA.
Since this tax directly conflicts with the OCSLA, the amount of income generated by the production of oil and gas on the outer Continental Shelf should be excluded from the net income subject to Florida's corporate income tax pursuant to section 220.02(5), Florida Statutes (1985). The proper amount to be excluded is the fair market value of the oil and gas at the well head. This is a well established and commonly accepted practice in the industry for determining the value of oil and gas, and is in fact, the method used by the United States government itself in determining the price it pays for oil and gas produced on the outer Continental Shelf. See 43 U.S.C. § 1353(2).
In every other respect I agree with the majority opinion. But because of the reasons discussed above, I feel compelled to dissent. I would therefore reverse the decision of the district court of appeal and remand this case to the trial court for further proceedings consistent with this dissent.
SHAW, J., concurs.
NOTES
[1] In certifying the above question to this Court, the district court cited to the presently existing section 1333(a)(2)(A). For purposes of the instant case, we shall deal with this statute as it existed during the period relevant to our review, 43 U.S.C. § 1333(a)(2) (1970).
[2] If this were not so, we would be at a loss to understand why the United States Supreme Court, in Maryland v. Louisiana, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), tested the validity of Louisiana's "first use" tax by examining its effect on interstate commerce rather than by scrutinizing the viability of taxing gas derived from the outer continental shelf.