BLUE, J.
 

 This case involves the heaven and the earth. The plaintiff, NERAC, Inc. (NERAC), claims that it is an instrumentality of the National Aeronautics and Space Administration (NASA) and that the state of Connecticut is consequently prohibited from taxing certain purchases that it has made. For the reasons set forth below, this contention is correct.
 

 The parties have submitted an extensive factual stipulation. In addition, some relevant facts are contained in official government documents, and the background of this case in the space race and the cold war is a matter of well-known historical fact.
 

 The launching of the sputnik satellite by the former Soviet Union on October 4, 1957, had a galvanic effect on the United States. It became imperative, or at least so it was thought, for our nation to catch and overtake the Soviet Union in matters of technology and space science. This plainly required a tremendous effort. The Congressional response to this perceived crisis was the enactment of the National Aeronautics and Space Act of 1958, 72 Stat. 426 (NASA Act) (codified as amended at 42 U.S.C. § 2451 et seq.).
 

 The hopes and fears that inspired the NASA Act are vividly set forth in the House Report that accompanied it: “The Soviet sputniks have been a visible symbol, warning that the United States may not be leading in the vital field of space research and in the development of astronautics. This country is not unmindful of what
 
 *332
 
 these Soviet achievements mean in terms of military defense, of international prestige, and of general scientific advance. At the same time, a properly developed United States program to explore the potential uses of space must and can stand on its own rights. The program must be soundly conceived and soundly administered. It must not falter, then rush ahead only when prodded by some spectacular Soviet success, but rather must advance as a broad-based, sustained, long-range effort to use the properties of space, and to explore space either by proxy through instruments, or by sending man himself. ... It would be unfortunate, to say the least, for the United States to renounce an opportunity for sharing in astronautics discoveries which are bound to be made. Yet this unfortunate result could follow from current failure to organize a sound program to exploit easily proven techniques which can carry men and instruments into outer space. The Soviet lead in astronautics has made clear that ‘business as usual’ is not going to close the gap between United States and Soviet capabilities. Nor can even an intensive program of ‘me too’ do more than keep this country following behind the Soviet Union. This is particularly true when one considers the long lead times required for many astronautics programs, and the series of surprises the Soviets have already accomplished in the scientific area.
 
 The United States must leapfrog these Soviet accomplishments.
 
 This will take some years, and will require a genuine mobilization, on a national scale, of the vast scientific and technical capabilities of this country. It would be a most serious mistake, and self-defeating in results, to choose some few isolated projects with the hope of influencing world opinion as to the superiority of our technology. Although the Soviet demonstrations in one sense could be viewed as tricks designed to sway world opinion, such an assessmenet
 
 *333
 
 tragically underestimates the Soviet approach to astronautics. The Soviet advance presupposes abroad scientific effort of many years’ standing. It is based on a long-range plan of scientific education and research. It has combined, since World War II, the military development of rockets and missiles with the scientific resources of the countiy. In 1955, 3 years ahead of the United States, the Soviet Union set up a strong civilian astronautics agency, able to command all the resources of the nation. That agency in the Academy of Sciences, which sits at the same level as the Presidium of the Supreme Soviet, announced detailed plans for its satellites of varying weights, and also announced its plans for moon exploration and instrumented probes of Mars and Venus. These announcements were made 2 or 3 years ago. We have similar plans, still under discussion or only this year being specifically authorized for the years ahead. Whatever the United States may think of other aspects of the Soviet political system, there is little doubt that a single
 
 coordinated
 
 agency offers tremendous advantages over the fragmented, uncoordinated effort which the United States has made to date. A haphazard effort involves the dangers of duplication and incompleteness, together with competition for funds and headlines, to the detriment of rapid attainment of national goals. This is not to say that there is not room for alternative approaches, and for the development of different teams and facilities, but all these should be pointed toward the fulfillment of a well-rounded, comprehensive national plan.” (Emphasis in original.) H.R. Rep. No. 1770, 85th Cong., 2d Sess. (1958), reprinted in 1958 U.S.C.C.A.N. 3160, 3161, 3163-64.
 

 In passing the NASA Act, “Congress expected that NASA would invoke the participation of private industry and of educational institutions in embarking on the
 
 *334
 
 nation’s space effort.”
 
 Lodge 1858, American Federation of Government Employees
 
 v.
 
 Webb,
 
 580 F.2d 496, 501 (D.C. Cir.), cert. denied, 439 U.S. 927, 99 S. Ct. 311, 58 L. Ed. 2d 319 (1978). “Congress gave NASA a specific, giant task in need of quick fulfillment . . . .” Id., 503. It was anticipated from the start that NASA would utilize private industry and educational institutions in obtaining these goals. The nature of these goals is important. One of these goals was the defeat of the Soviet Union in the space race, but a broader — and vitally important — goal was the establishment of American technological superiority. Congress saw the NASA Act as an “opportunity for science and technology” to obtain “the ultimate economic benefits of technological progress.” 104 Cong. Rec. 9917 (1958), remarks of Representative John McCormack.
 

 These goals are reflected in the text of the NASA Act itself. “The aeronautical and space activities of the United States” are to “be conducted so as to contribute materially to . . . [t]he preservation of the role of the United States as a leader in aeronautical and space science and technology and in the application thereof to the conduct of peaceful activities within and outside the atmosphere . . . .” 42 U.S.C. § 2451 (d) (5) (codifying NASA Act). In 1988, Congress added the goal of “[t]he preservation of the United States preeminent position in aeronautics and space through research and technology development related to associated manufacturing processes.” 42 U.S.C. § 2451 (d) (9) (codifying National Aeronautics and Space Administration Act, Fiscal Year 1989, 102 Stat. 4083, 4093 [1988]). In order to carry out the purpose of the NASA Act, NASA is to “provide for the widest practicable and appropriate dissemination of information concerning its activities and the results thereof.” 42 U.S.C. § 2473 (a) (3). NASA is authorized “to enter into and perform such contracts, leases, cooperative agreements, or other transactions
 
 *335
 
 as may be necessary in the conduct of its work and on such terms as it may deem appropriate, with any agency or instrumentality of the United States ... or with any person, firm, associates, corporation, or educational institution.” 42 U.S.C. § 2473 (c) (5).
 

 At an early date, NASA began a Technology Utilization Program. The object of this program is to enable industry to develop secondary applications, sometimes called spinoffs, of NASA technology and thereby produce new products. One important component of this program is the use of Industrial Application Centers (IACs). There are currently ten IACs, affiliated with universities throughout the country. These IACs provide the private sector with access to a national data bank that includes more than 100 million documents of accumulated technical knowledge. The IACs also provide expertise in retrieving information from the data bank and applying it to specific problems.
 

 NERAC (an acronym for New England Research Applications Center) is an IAC. NASA originally established it at the University of Connecticut in 1967. National Aeronautics and Space Administration, Seventeenth Semiannual Report to Congress (1967) 153, 221 (Seventeenth Semiannual Report to Congress). In 1985, NERAC severed its ties from the University of Connecticut for two reasons. It was becoming too large to operate within the University’s framework, and the burdens imposed by the state administrative system were too great. NERAC was then incorporated as a new entity under the Connecticut Nonstock Corporation Act, General Statutes § 33-419 et seq. As NASA requires, NERAC is a nonprofit coiporation. NERAC’s certificate of incorporation states that it is “a membership coiporation,” the “members” being “one or more individuals or business entities, including business corporations organized for profit, interested in the distribution and effective
 
 *336
 
 utilization of new technological developments throughout our society.” The certificate of incorporation further states that the purpose of the corporation is: “To further the public interest through such means as the compilation, analysis and delivery of a wide range of technical and other information obtained pursuant to contractual or other arrangements with such governmental organizations as NASA as well as from other non-profit and profit-maMng enterprises in order to assist NASA and other information-developer organizations in their important efforts to assure broad distribution and productive utilization of new technological developments throughout our society.”
 

 Shortly after NERAC was incorporated, it signed a contract with NASA to operate an IAC. The contract obliges NERAC to provide to its clients the full range of NASA technology and allows NERAC to add “information bases through otherwise available resources likely to be useful to users.” In performing its duties under the contract, NERAC provides its clients with document retrieval, problem solving, and update services. During the tax years in question, NERAC performed no work other than its operation of the IAC under the contract.
 

 In order to perform its duties under the contract, NERAC must purchase certain hardware. The hardware includes computers, a telephone system, and other equipment. These purchases are governed by a provision of the contract that “[a]ll property necessary for performance hereunder shall be purchased on account and at the expense of the Government with the title vesting within the Government.” NERAC is subject to the same federal acquisition regulations that apply to NASA when making these purchases. All such property is placed on an authorized property list and tagged as federal government property.
 

 
 *337
 
 In order to fulfill its mission effectively, NERAC must also subscribe to certain databases from private vendors. These subscriptions are not affirmatively required by the NASA contract, but they are allowed by it and, the evidence strongly suggests, encouraged by NASA as well. During the tax years in question here, July 1, 1985 to March 31, 1988, NERAC had thirty-nine such subscriptions. These subscriptions are made on an annual basis. In some cases, a royalty fee is also paid to the vendor each time the database is accessed. All of these databases are regularly updated on schedules varying from weekly to quarterly. NERAC receives these databases on computer magnetic tape. If a subscription is not renewed, NERAC must either return all material it has received or certify that the material has been destroyed. The parties stipulate that NERAC’s property interest in the databases it uses is “analogous to the property interest of a lessee in leased property.”
 

 The total database that NERAC provides to its clientele is a combination of the NASA database, other federal government databases, and the private databases to which NERAC subscribes. During the tax years in question, NERAC’s database library contained approximately 63.2 million items of information. The federal government databases contained approximately 15.5 million items of information, of which 1.9 million were on the NASA database. The thirty-nine private vendor databases contained a combined total of approximately 47.7 million items of information. The NASA database is, however, unusually important. That database was consulted on
 
 every
 
 database search that NERAC performed for its clients during the tax years in question. This statistic becomes even more impressive when it is realized that NERAC performs over 100,000 searches a year. The NASA database is NERAC’s primary source of information. The non-NASA databases serve as a
 
 *338
 
 reference library for supplemental information related to space research and commercialization.
 

 NASA has expressly acknowledged NERAC’s specific role in the NASA mission. The 1988 issue of Spinoff, an official NASA publication, states that “[o]ne of NASA’s jobs is to translate the potential [of aerospace technology] into reality through an organized effort to put the technology to work in secondary applications and thereby reap a dividend on the national investment in aerospace research.” Spinoff 136 (1988). The ten IACs are said to be “[a] key element of the program,” and NERAC is said to be “[a] representative 1AC.” Id. Spinoff goes on to say that: “NERAC’s purpose is to provide U.S. industry and individual entrepreneurs access to existing and evolving technologies, with the aim of enhancing and evolving technologies, with the aim of enhancing their innovation and productivity and helping them secure a competitive edge in the global market place. The center has helped literally thousands of companies to find new applications; stay abreast of scientific, technical and business developments; gain competitive intelligence; identify qualified technical experts; and monitor patent activity.” Id.
 

 NERAC is funded by both payments from NASA pursuant to its contract and fees charged to private industry for its technology transfer services. NASA envisioned when NERAC was founded that it would eventually “become self-supporting on the basis of industrial fees for these services.” Seventeenth Semiannual Report to Congress, supra, 153. In its first six years, NERAC received approximately $4.7 million from NASA and $28.2 million from fees.
 

 With NASA’s permission, NERAC prominently displays NASA’s logo on its stationery. NERAC’s employees are considered private employees, although two are retired NASA employees. The office space and support
 
 *339
 
 staff for these two employees are paid by NASA. NERAC works closely with NASA in developing and marketing its databases.
 

 This case presents the question of whether NERAC’s hardware purchases and private database subscriptions and royalty fees can appropriately be subject to Connecticut’s sales and use tax. During the period of its affiliation with the University of Connecticut, NERAC was not subject to this tax on the class of purchases, subscriptions, and royalty fees that are not in question. When NERAC severed its ties with the University of Connecticut, however, the state department of revenue services asserted that these items were now taxable and claimed a substantial deficiency. This appeal has now followed. The question presented is one of national first impression, since NASA’s other IACs have not been subjected to sales and use taxation in their respective states.
 

 General Statutes § 12-412 provides in relevant part that: “Taxes imposed by this chapter shall not apply to the gross receipts from the sale of and the storage, use or other consumption in this state with respect to the following items: (1) The United States, the state or subdivisions. (A) Sales of tangible personal property or services to the United States, the state of Connecticut or any of the political subdivisions thereof, or its or their respective agencies .... (2) Federal Exemptions. Sales of tangible personal property or services which this state is prohibited from taxing under the constitution or laws of the United States.” I have recently explained, in
 
 Rich-Taubman Associates
 
 v.
 
 Meehan,
 
 Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 378380 (November 9, 1994) (12 Conn. L. Rptr. 649), that subsections (1) and (2) are to be read in a straightforward way. Subsection (1) exempts purchases by “the United States, the state of Connecticut or any of the political subdivisions
 
 *340
 
 thereof, or its or their respective agencies.” (Internal quotation marks omitted.) Id., 650. “This is an exemption for purchases by the specified political entities and not for purchases by anyone else.” Id., 651. NERAC is not itself a specified political
 
 entity and
 
 does not qualify for exemption under subsection (1).
 

 The focal point of this case is subsection (2). Are the sales in question sales “which this state is prohibited from taxing under the constitution or laws of the United States?” There being no federal statutes that expressly prohibit taxation in this context, the disposition of this case necessarily turns on whether the federal constitution prohibits the taxation here. “While Congress may expressly designate an entity exempt from tax ... a court may also conclude that a body is a Federal instrumentality constitutionally immune from State taxation.” (Citations omitted.)
 
 Continental Bank International
 
 v.
 
 Dept. of Finance,
 
 69 N.Y.2d 281, 287-88, 506 N.E.2d 525, 513 N.Y.S.2d 954 (1987), appeal dismissed, 486 U.S. 1001, 108 S. Ct. 1723, 100 L. Ed. 2d 187 (1988). I conclude that NERAC is such an instrumentality.
 

 The parties in this case focus their arguments on
 
 United States
 
 v.
 
 New Mexico,
 
 455 U.S. 720, 102 S. Ct. 1373, 71 L. Ed. 2d 580 (1982), and
 
 Avco Mfg. Corp.
 
 v.
 
 Connelly,
 
 145 Conn. 161, 140 A.2d 479 (1958).
 
 New Mexico
 
 and
 
 Avco Mfg. Corp.
 
 involve the taxability of contractors who supply items or services to the federal government.
 
 Avco Mfg. Corp.,
 
 relying on the federal case law prevailing at the time, used an agency test to determine whether a state tax violates the supremacy clause. “If an agency relationship was found to exist between the contractor and the government, then the tax on the contractor violated the supremacy clause.”
 
 United Technologies Corp.
 
 v.
 
 Groppo,
 
 35 Conn. App. 72, 78, 644 A.2d 1309 (1994). After
 
 Avco Mfg. Corp.
 
 was decided,
 
 New Mexico
 
 articulated a new test to be applied to the state taxation of government contractors.
 
 *341
 

 New Mexico
 
 holds that “tax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned.”
 
 United States
 
 v.
 
 New Mexico,
 
 supra, 735. In articulating this test,
 
 New Mexico
 
 uses metaphorical language. It states that, “a finding of constitutional tax immunity requires something more than the invocation of traditional agency notions: to resist the State’s taxing power, a private taxpayer must actually ‘stand in the Government’s shoes.’ ” Id., 736, quoting
 
 Detroit
 
 v.
 
 Murray Corp.,
 
 355 U.S. 489, 503, 78 S. Ct. 458, 2 L. Ed. 2d 441 (1958) (Frankfurter, J.). The taxpayer must be “ ‘virtually ... an arm of the Government.’ ”
 
 United States
 
 v.
 
 Mexico,
 
 supra, 736-37, quoting
 
 Dept. of Employment
 
 v.
 
 United Stales,
 
 385 U.S. 355, 359-60, 87 S. Ct. 464, 17 L. Ed. 2d 414 (1966).
 

 While students of anatomy are puzzling over exactly how an arm of the government can stand in the government’s shoes, the real problem in this case is the application of the
 
 New Mexico
 
 test to the facts at hand. In this context,
 
 New Mexico
 
 itself is of only limited assistance. That case deals with contractors who supply services to the federal government. In this regard, it looks to several factors involving the specific goverment purchases in question. See
 
 United Technologies Corp.
 
 v.
 
 Groppo,
 
 supra, 35 Conn. App. 78-79. But while these factors are of considerable importance in dealing with government supplier cases like
 
 New Mexico, Avco Mfg. Corp.,
 
 and
 
 United Technologies Corp.,
 
 they are of limited assistance in this case. This case involves not government suppliers but the use by the federal government of a private corporation to carry out a national object. This is a critical distinction. See
 
 United States
 
 v.
 
 Spokane,
 
 918 F.2d 84, 87-88 (9th Cir. 1990),
 
 *342
 
 cert. denied, 501 U.S. 1250, 111 S. Ct. 2888, 115 L. Ed. 2d 1053 (1991). A significant body of precedent involving such instrumentalities exists, since the federal government has made use of private corporations to carry out its national goals throughout most of its history. See
 
 Keifer & Keifer
 
 v.
 
 Reconstruction Finance Corp.,
 
 306 U.S. 381, 390-91, 59 S. Ct. 516, 83 L. Ed. 784 (1939). The analyses contained in this line of cases have to some extent been superseded by
 
 New Mexico,
 
 but in announcing a new test,
 
 New Mexico
 
 by no means repudiates these cases altogether. Indeed,
 
 New Mexico
 
 favorably cites one of these
 
 cases
 
 — Dept.
 
 of Employment
 
 v.
 
 United States,
 
 supra, 385 U.S. 355 — in its opinion. See
 
 United States
 
 v.
 
 New Mexico,
 
 supra, 455 U.S. 736-37. For this reason, these decisions retain at least some continuing vitality.
 

 The Supreme Court first considered the problem of federal instrumentalities in the celebrated case of
 
 McCulloch
 
 v.
 
 Maryland,
 
 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819).
 
 McCulloch,
 
 as is well-known, involved an attempt by the state of Maryland to tax the notes of the Second Bank of the United States (bank). The bank had been chartered by Congress in 1816, but it was “a largely private, profit-making commercial institution,” the charter of which provided that “80% of the stock ownership and of the directors were to be private.” G. Gunther, Constitutional Law (12th Ed. 1991) p. 85. On the other hand, the government aggressively used the bank as the central bank of the United States. H. Pious & G. Baker,
 
 “McCulloch
 
 v.
 
 Maryland:
 
 Right Principle, Wrong Case,” 9 Stan. L. Rev. 710, 717 (1957). In the context of the time, “[s]uch a bank was the only practical method whereby Congress could recover control of the general currency.” J. Lynch,
 
 “McCulloch
 
 v.
 
 Maryland:
 
 A Matter of Money Supply,” 18 Seton Hall L. Rev. 223, 277 (1988). The Supreme Court held that the Maryland tax on the bank was “a tax on the operation of an
 
 *343
 
 instrument employed by the government of the Union to carry its powers into execution.”
 
 McCulloch
 
 v.
 
 Maryland,
 
 supra, 436-37. Although subsequent decisions have called this holding into some question, the modern Supreme Court has expressly declined to repudiate it.
 
 First Agricultural National Bank
 
 v.
 
 State Tax Commission,
 
 392 U.S. 339, 340-41, 88 S. Ct. 2173, 20 L. Ed. 2d 1138 (1968); but see
 
 Continental Bank International
 
 v.
 
 Dept. of Finance,
 
 supra, 69 N.Y.2d 289 (holding that federally chartered banks not internally led by “strong Federal hand” and receiving “no financial assistance from the Federal Government” may be taxed).
 

 The Supreme Court returned to the problem of federal instrumentalities in
 
 Railroad Co.
 
 v.
 
 Peniston,
 
 85 U.S. (18 Wall.) 5, 21 L. Ed. 787 (1873).
 
 Peniston
 
 involved a state tax on the property of the Union Pacific Railroad Company (Union Pacific). The Union Pacific was a corporation chartered by Congress for private gain. All of its stock was owned by individuals. Two of its directors were, however, appointed by the federal government, and Congress assisted it with donations and loans. A divided Supreme Court held that the state property tax in question was constitutional. Id., 37. The majority opinion was based on a distinction between a tax on the property of an agent and a tax on the agent’s operations that has since been rejected. See
 
 California State Board of Equalization
 
 v.
 
 Sierra Summit, Inc.,
 
 490 U.S. 844, 848, 109 S. Ct. 2228, 104 L. Ed. 2d 910 (1989). The analysis of Justice Bradley’s dissenting opinion was, however, subsequently embraced by a majority of the court in
 
 James
 
 v.
 
 Dravo Contracting Co.,
 
 302 U.S. 134, 155, 58 S. Ct. 208, 82 L. Ed. 155 (1937). That opinion remains of considerable interest. In Justice Bradley’s judgment, the tax in question was an unconstitutional interference with an instrumentality of the national government. Id., 42. In language seized upon by the court in
 
 James,
 
 he explained that: “The case differs toto coelo
 
 *344
 
 from that wherein the government enters into a contract with an individual or corporation to perform services necessary for carrying on the functions of government — as for carrying the mails, or troops, or supplies, or for building ships or works for government use. In those cases the government has no further concern with the contractor than in his contract and its execution. It has no concern with his property or his faculties independent of that. How much he may be taxed by, or what duties he may be obliged to perform towards, his State is of no consequence to the government, so long as his contract and its execution are not interfered with. In that case the contract is the means employed for carrying into execution the powers of the government, and the contract alone, and not the contractor, is exempt from taxation or other interference by the State government. But where the General goverment creates a corporation as a means of carrying out a national object, that corporation and its powers, property, and faculties, employed in accomplishing the service, are the instrumentalities by which the government effects its objects. Hence the corporation is not taxable by State authority. And it matters not that private individuals are interested for their private gain in the stock of the corporation. Such individual interest may be taxable by itself, but the corporation and its property and operations cannot be, without interfering with the agencies used by the government for the accomplishment of its objects.”
 
 Railroad Co.
 
 v.
 
 Peniston,
 
 supra, 41-42.
 

 In
 
 Clallam County
 
 v.
 
 United States,
 
 263 U.S. 341, 44 S. Ct. 121, 68 L. Ed. 328 (1923), the Supreme Court considered the taxability of the United States Spruce Production Corporation, a corporation formed by the director of aircraft production during World War I to produce what the opinion quaintly refers to as “aeroplane lumber.” The corporation was organized under the laws of the state of Washington, but its shares were
 
 *345
 
 controlled by the federal government and it was funded by the federal government as well. The court held that the corporation was not subject to state taxation. Id., 344. It explained that, “[t]his is not like the case of a corporation having its own purposes as well as those of the United States and interested in profit on its own account. The incorporation and formal erection of a new personality was only for the convenience of the United States to carry out its ends.” Id., 345.
 

 Perhaps the most pertinent case considering a federal instrumentality is
 
 Dept. of Employment
 
 v.
 
 United, States,
 
 supra, 385 U.S. 355.
 
 Dept. of Employment
 
 involves the American National Red Cross (Red Cross). The case began when Colorado imposed an unemployment compensation tax on the Red Cross’ Colorado employees. The Supreme Court held that “the Red Cross is an instrumentality of the United States for purposes of immunity from state taxation.” Id., 358. It explained that: “Although there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality, the Red Cross is clearly such an instrumentality. See generally, Sturges, The Legal Status of the Red Cross, 56 Mich. L. Rev. 1 (1957). Congress chartered the present Red Cross in 1905, subjecting it to governmental supervision and to a regular financial audit by the Defense, then War, Department. 33 Stat. 599, as amended, 36 U.S.C. § 1 et seq. Its principal officer is appointed by the President, who also appoints seven (all government officers) of the remaining 49 Governors. 33 Stat. 601, as amended, 36 U.S.C. § 5. By statute and Executive Order there devolved upon the Red Cross the right and the obligation to meet this Nation’s commitments under various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster
 
 *346
 
 assistance to the States in time of need. Although its operations axe financed primarily from voluntary private contributions, the Red Cross does receive substantial material assistance from the Federal Government. And time and time again, both the President and the Congress have recognized and acted in reliance upon the Red Cross’ status virtually as an arm of the Government. In those respects in which the Red Cross differs from the usual government agency — e.g., in that its employees are not employees of the United States, and that government officials do not direct its everyday affairs — the Red Cross is like other institutions — e.g., national banks — whose status as tax-immune instrumentalities of the United States is beyond dispute.” Id., 358-60.
 

 Read closely,
 
 Dept. of Employment
 
 is entirely consistent with
 
 New Mexico.
 
 Not only does
 
 New Mexico
 
 favorably cite
 
 Dept. of Employment,
 
 as already mentioned, but the analyses contained in their opinions are harmonious.
 
 New Mexico
 
 holds that tax immunity is appropriate when “an agency or instrumentality [is] so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned.”
 
 United States
 
 v.
 
 New Mexico,
 
 supra, 455 U.S. 735.
 
 Dept. of Employment
 
 similarly looks to “whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality.”
 
 Dept. of Employment
 
 v.
 
 United States,
 
 supra, 385 U.S. 358-59. The difference between them is that
 
 New Mexico
 
 applies this test to a government supplier and
 
 Dept. of Employment
 
 applies the same test to a government instrumentality. In this respect,
 
 Dept. of Employment
 
 is the more helpful of the two cases in determining the status of NERAC.
 
 Dept. of Employment
 
 teaches that “there is no simple test for ascertaining whether an institution is so closely
 
 *347
 
 related to governmental activity as to become a tax-immune instrumentality . . . .” Id., 358-59. Rather, it looks to a number of factors involving both the role of the instrumentality in attaining specified national goals and the role of the government guiding and working with the instrumentality. This approach is consistent with
 
 McCulloch, Clallam County,
 
 and Justice Bradley’s dissent in
 
 Peniston
 
 as well.
 

 The task of determining NERAC’s status is inescapably judgmental since “no simple test” applies. In light of the cases discussed above, however, I conclude that NERAC is a government instrumentality. Its role as an instrumentality in attaining specified national goals is clear. The Congress that passed the NASA Act plainly intended to stimulate the country’s technological progress and authorized NASA to enter into arrangements with a variety of instrumentalities to disseminate information. NASA established NERAC in its precorporate form. NASA continued to view NERAC, in its post-incorporation years, as a “key element” of its program. Spinoff, supra, 136. NERAC can, consequently, fairly be characterized as an instrumentality “by which the government effects its objects.”
 
 Railroad Co.
 
 v.
 
 Peniston,
 
 supra, 85 U.S. (18 Wall.) 42 (Bradley, J., dissenting).
 

 The factors pertaining to the role of the federal government in guiding and working with NERAC are mixed. NERAC is, of course, a private corporation, but the cases that have been discussed make it clear that this factor is not, in itself, fatal. In addition,
 
 Dept. of Employment
 
 v.
 
 United States,
 
 supra, 385 U.S. 360, establishes that the fact “that its employees are not employees of the United States, and that government officials do not direct its eveiyday affairs,” is not fatal either. The fact that NERAC is a state corporation not chartered by Congress likewise fails to disqualify it from tax-exempt status, as
 
 Clallam County
 
 makes clear. The fact that
 
 *348
 
 the federal government plays no role as either a shareholder, director, “member,” or officer of the corporation is, however, much more problematic.
 
 McCulloch, Peniston, Clallam County, and Dept. of Employment all
 
 involved corporations in which the federal government had at least some formal role — whether as majority or minority shareholder or the appointer of directors or officers — in corporate government. NERAC is a non-stock corporation, the “members” of which are private organizations or individuals. The government plays no role in its formal governance.
 

 Dept. of Employment,
 
 however, teaches that there is “no simple test” in these matters. The evidence is clear that NASA works closely with NERAC in a variety of ways in carrying out their respective missions. Further, NERAC is similar to the Red Cross in that “[a]lthough its operations are financed primarily from . . . private contributions, [it] does receive substantial material assistance from the Federal Government.”
 
 Dept. of Employment
 
 v.
 
 United States,
 
 supra, 385 U.S. 359. Finally, it is of critical importance that NERAC is not a profit-making enterprise like the government contractors held taxable in
 
 New Mexico.
 
 Those contractors were found to be “distinct entities pursuing ‘private ends,’ and their actions remained ‘commercial activities carried on for profit.’ ”
 
 United States
 
 v.
 
 New Mexico,
 
 supra, 455 U.S. 739, quoting
 
 United States
 
 v.
 
 Boyd,
 
 378 U.S. 39, 44, 84 S. Ct. 1518, 12 L. Ed. 2d 713 (1964). NERAC, in contrast, is a non-profit organization — and, as the evidence shows,
 
 is required to be a non-profit organization by NASA itself
 
 In this respect, NERAC is much more clearly an instrumentality of the federal government than was the Second Bank of the United States, found to be a government instrumentality in
 
 McCulloch,
 
 or, for that matter, the Union Pacific Railroad considered in
 
 Peniston.
 
 The contractors at issue in
 
 New Mexico
 
 had no “congruence of professional
 
 *349
 
 interests” with the federal government.
 
 United States
 
 v.
 
 New Mexico,
 
 supra, 740. There is such a congruence here.
 

 It is finally appropriate to consider the relationship between NERAC and the federal government “insofar as the activity being taxed is concerned.” Id., 735. There are two different activities being taxed here: NERAC’s purchases of personal computers, a telephone system, and other equipment, and its subscription and royalty fees for private databases. These items will be briefly considered in turn.
 

 As explained above, the “hardware” purchases — the computers, telephones, and other equipment — were, as a result of the contract with NASA, purchased “at the expense of the Government with the title vesting within the Government.” This factor is not itself dispositive; see
 
 United States
 
 v.
 
 New Mexico,
 
 supra, 455 U.S. 734; but combined with the factors already considered, I conclude that in making these purchases, NERAC was an “instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities . . . .” Id., 735.
 

 The subscriptions and royalty fees are more problematic. These were subscriptions to and fees for private databases. It is clear, however, that NASA allowed, encouraged, and to some extent guided NERAC in making these subscriptions and paying these fees. NASA’s goal is the widest possible dissemination of technological information and the enhancement of the usefulness of its own information, and — again, as a direct result of its relationship with NASA — this was NERAC’s very goal in making these subscriptions and paying these fees. I conclude that, in making these subscriptions and paying these fees, NERAC acted as a government instrumentality.
 

 
 *350
 
 For the reasons stated above, the sales and use taxes in question cannot constitutionally be imposed. Judgment shall enter for the plaintiff.