**UNITED STATES of America,
Plaintiff,**

v.

**CLARK COUNTY, INDIANA,
Defendants.**

No. NA 99–230–C–B/H.

United States District Court,
S.D. Indiana,
New Albany Division.

Dec. 17, 2002.

Jeffrey L. Hunter, United States Attorney's Office, Indianapolis, IN, David Katinsky, Trial Attorney Tax Division, U.S. Dept of Justice, Washington, DC, for Plaintiff.

David A. Arthur, Deputy Attorney General, Indianapolis, IN, John W. Doehrman, Jeffersonville, IN, Gayle Reindl, Sommer Barnard Ackerson Pc, Indianapolis, IN, for Defendant.

## MEMORANDUM DECISION ON PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

BARKER, District Judge.

### I. Introduction

Professor Lawrence Tribe, the noted constitutional scholar, discussed at length and in eloquent detail in a 1976 Harvard Law Review article (89 Harvard Law Review 682 (1976)), the issue now before this Court, to wit, the scope of federal immunity from state taxation, describing the legal decisions relating to this issue as a "bewilderingly complex array of judicial decisions." 89 Harv.L.Rev. 682, 704. We fully agree with that characterization; in addition, the decisions handed down since Professor Tribe's article have not made the analysis any less bewildering. Nevertheless, we have soldiered on in an effort to determine whether a corporation which entered into a "Facilities Use Agreement" with the federal government is entitled to immunity from state imposed property taxes. Added to this "bewilderingly complex" issue is an additional question: whether the United States, as Plaintiff, is precluded by the doctrine of res judicata or collateral estoppel from challenging the assessments of taxes previously affirmed by Indiana state courts.

We have before us the cross-motions for summary judgment by the Plaintiff, United States of America ("United States"), and the Defendant, Clark County, Indiana ("Clark County"). Additionally, the Attorney General of the State of Indiana has filed an Amicus Curiae brief, pursuant to 28 U.S.C. § 2403(b) and S.D. Ind. Local Rule 24.1, as the constitutionality of an Indiana statute (IND.CODE § 6–1.1–10–37) has been challenged by the United States.

The United States seeks to prevent Defendant, Clark County, from assessing, imposing or collecting a tax with respect to vacant buildings located at the Indiana Army Ammunition Plant ("Plant").[1] The size of the Plant approximates 10,000 acres located near Charlestown, Indiana, which is owned by the United States and operated under the jurisdiction of the United States Operations Support Command (for-

---

1. Apparently, the United States does not contest Clark County's right to impose a tax on ICI Americas, Inc. ("ICI") for buildings which it rented or used. Rather, the issue before us is whether Clark County may assess a tax upon ICI based upon the existence of other structures at the Plant that ICI never used or leased to any other entity. We develop this discussion in great detail *supra*.

merly the Industrial Operations Command) ("the Army"), based in Rock Island, Illinois. The Plant contains 1,633 real property structures, including 176 storage igloos or magazines originally designed and utilized for the manufacture and storage of high explosives. From 1940 through 1992, the Army permitted the manufacture of military propellants at the Plant by civilian contractors, one of whom was ICI. In 1992, the Plant was deactivated and ceased manufacture of military propellants.

Also, in 1992, Congress passed the Armament Retooling and Manufacture Support Act of 1992, P.L. No. 102–484 ("Arms Act"), pursuant to which Congress granted the Army the authority to convert unused government-owned ammunition plants, or parts thereof, to civilian use facilities. There were nine specified purposes included in the Arms Act: (1) to encourage the commercial use of government-owned, contractor-operated ("GOCO") facilities; (2) to enable small business and small disadvantaged business use of GOCOs; (3) to reduce the adverse effects of downsizing on communities; (4) to re-employ and retain skilled workers; (5) to attain economic stability in depressed areas; (6) to maintain the workforce skills necessary for national security purposes; (7) to provide a model for future defense conversion programs; (8) to allow GOCOs to be responsive in free market competition; and (9) to relocate off-shore production to the United States. Pub.L.No. 102–484, Sec. 193(b) (as noted with 10 U.S.C. § 2501).

Prior to the passage of the Arms Act, the United States had contracted with a corporation known as ICI Americas, Inc. (hereafter "ICI") to perform certain functions at the Plant. Clark County levied a 1995 tax against ICI based upon vacant Plant buildings, pursuant to IND.CODE § 6–1.1–10–37. The United States asserts that this was an unconstitutional tax levy in that it was, in reality, a tax against the United States, in violation of the Supremacy Clause of the Constitution. Clark County contends that the tax was in fact levied only against ICI, not the United States, and that it was based on ICI's leasehold interest in the vacant buildings at the Plant. Additionally, noting that the Indiana State Board of Tax Commissioners ("State Board") upheld these tax levies and later dismissed ICI's appeal of those decisions, Clark County asserts res judicata and collateral estoppel as bars to relitigation of most of these taxation issues.

## II. Legal Analysis

### A. Collateral Estoppel

In our order of September 18, 2000, denying Clark County's Motion to Dismiss, we set out the law concerning collateral estoppel, or issue preclusion, and its application in this case. *See U.S. v. Clark County, Ind.,* 113 F.Supp.2d 1286, 1290–91 (S.D.Ind.2000). We see no reason to reiterate that discussion here, but will move to apply those principles to the facts and arguments here, in light of the parties' motions and briefs in support of their respective motions for summary judgment.

■ In order to establish claim preclusion under Indiana law, the proponent must establish that: (1) the former judgment was issued by a court with jurisdiction; (2) the matter now in issue was or might have been determined in the former suit; (3) the parties or their privies are identical; and (4) there was a judgment on the merits. *Breeck v. City of Madison,* 592 N.E.2d 700, 704–05 (Ind.Ct.App.1992). The parties' dispute here centers on the first and third requirements; namely, whether the Indiana Tax Court had jurisdiction over ICI's appeal of Clark County's tax levy and whether ICI and the United States are in privity with one another.

Regarding the first requirement, the United States asserts that the Tax Court did not have jurisdiction over ICI's appeal because ICI never perfected that appeal. Additionally, the United States contends that the Tax Court's order stated that the appeal was dismissed for lack of jurisdiction. We recognize that Indiana courts use the term "jurisdiction" in varying ways. "Jurisdiction is comprised of three elements: (1) jurisdiction of the subject matter; (2) jurisdiction of the person; and (3) jurisdiction of the particular case." *Browning v. Walters*, 620 N.E.2d 28, 31 (Ind.Ct.App.1993) (citing *Harp v. Indiana Dept. of Highways*, 585 N.E.2d 652, 659 (Ind.Ct.App.1992)). When the Tax Court dismissed ICI's appeal for lack of jurisdiction, its action reflected the fact that ICI had failed to perfect its appeal. ICI neglected to perform the statutorily required duty to serve copies of its appeal on the Clark County Assessor. This lack of jurisdiction, as noted in the order dismissing ICI's appeal, involved jurisdiction over that particular case, not a lack of jurisdiction over the subject matter, or the class of cases. Moreover, pursuant to the holding in *Browning*, a dismissal based on a litigant's failure to comply with the rules amounts to a dismissal with prejudice on the merits. *See Browning*, 620 N.E.2d at 31–32.

A similar situation was presented in *Yellow Cab Co. of Bloomington, Inc. v. Williams*, 583 N.E.2d 774 (Ind.Ct.App. 1991). There, the Bloomington Human Rights Commission issued an adverse ruling to Yellow Cab based on a discrimination claim. *Id.* at 776. Yellow Cab sought judicial review of that decision, but its appeal was dismissed because it failed to timely file the administrative record.[2] *Id.* When the Commission attempted to enforce its order through supplemental proceedings, Yellow Cab again sought judicial review. *Id.* at 777. On appeal, Yellow Cab sought to raise issues that it would have raised had its initial appeal not been dismissed; however, the Appellate Court concluded that res judicata barred Yellow Cab from raising those issues. *Id.* at 777–79. The Court noted that an actual trial need not occur for the doctrine of res judicata to apply. *Id.* at 777. "If the parties had a full legal *opportunity* to be heard on their respective claims but there is no actual hearing ... for a failure to comply with the statutory prerequisites-it is just as much a bar to further litigation as a judgment on the merits." *Id.* (citing *Creech v. Town of Walkerton*, 472 N.E.2d 226 (Ind.Ct.App.1984)). The Tax Court's decision in the instant case stated only that the dismissal was for a lack of jurisdiction; applying the *Yellow Cab* analysis, we must conclude that prior to its default in serving copies of its appeal on the Clark County Assessor, ICI had the *opportunity* to be heard on the merits when it lodged its appeal. Therefore, under Indiana law, the dismissal, though based on procedural error and occurring without a hearing, was on the merits, with prejudice, and thus has claim preclusive effect.

Regarding the (third) requirement of privity between ICI and the United States, "privity" under Indiana law, for res

---

2. The United States attempts to distinguish *Yellow Cab* on the ground that in that matter the Plaintiff failed to follow a statutory rule after the trial court acquired jurisdiction, whereas the Tax Court in the present matter never obtained jurisdiction due to ICI's failure to serve the Clark County Assessor. This distinction is without merit, however, because the timely filing of an administrative record is "a condition precedent to a court acquiring jurisdiction to consider a petition for judicial review." *See Clendening v. Indiana Family and Social Services Admin.*, 715 N.E.2d 903, 904 (Ind.Ct.App.1999). In our case, the Tax Court acquired jurisdiction initially and then lost it.

judicata purposes, "includes those who were in control of the earlier action even though they were not a party to it, and those whose interests are represented by a party to the action." *Hermitage Ins. Co. v. Salts,* 698 N.E.2d 856, 859 (Ind.Ct.App. 1998). In *Montana v. U.S.,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), the Supreme Court noted that barring a showing that the government maintained a "laboring oar" in the state-court litigation, the preclusion doctrine is inapplicable to the United States. *Id.* at 155, 99 S.Ct. 970 (quoting *Drummond v. U.S.,* 324 U.S. 316, 318, 65 S.Ct. 659, 89 L.Ed. 969 (1945)).[3]

In *Montana,* the Supreme Court discussed the application of collateral estoppel to prevent the United States from relitigating a Montana State Court's imposition of a tax on a government contractor. The contractor argued that the state's "gross receipts tax unconstitutionally discriminated against the United States and the companies with which it dealt." *Id.* at 151, 99 S.Ct. 970. In resolving the matter, the Supreme Court noted the United States' stipulation, wherein it admitted that it:

(1) required the [contractor's] lawsuit to be filed;

(2) reviewed and approved of the complaint;

(3) paid the attorneys' fees and costs;

(4) directed the appeal from state district court to the Montana Supreme Court;

(5) appeared and submitted a brief as amicus in the Montana Supreme Court;

(6) directed the filing of a Notice of Appeal to the Court; and

(7) effectuated [the contractor's] abandonment of that appeal on advice of the Solicitor General.

*Id.* at 155, 99 S.Ct. 970. Based on these admissions, the Supreme Court concluded that, although the United States was not a party to the litigation, it "plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation to actuate principles of estoppel." *Id.*

In the instant matter, Clark County makes only three assertions relating to the United States' control of the state-court litigation: first, that the United States told ICI to resist the County's attempt to tax vacant buildings at the Plant; second, that the United States informed ICI in 1997 that it would pay all taxes Clark County successfully levied on the vacant buildings at the Plant; and finally, that as of January 1, 1999, the United States agreed to assume all responsibility for challenging and paying any successful tax levied on vacant buildings at the Plant. On their face, these allegations are not equivalent either in number or in effect to the admissions the United States made in *Montana.* Rather than relying on the actual role played by the United States in the state-court litigation, Clark County cites the fact that the United States could have stepped into the state-court litigation but chose not to. Clark County argues, "[I]t is indisputable that the government had the opportunity to control ICI's legal challenges to taxation with respect to vacant buildings at [the Plant], and especially the conduct of ICI's appeal to the Tax Court." (Defendant's Reply in Support of its Motion for Summary Judgment at 14). Having an opportunity to do something is not tantamount to pulling a "laboring oar."

**3.** The "laboring oar" exception is one of the few exceptions to the general rule that "the United States is rarely barred from independent litigation by the failure of a private plaintiff." *See U.S. v. State Texas,* 158 F.3d 299, 305–06 (5th Cir.1998) (quoting *U.S. v. East Baton Rouge Parish School Bd.,* 594 F.2d 56, 58 (5th Cir.1979)).

Therefore, we conclude that the United States' participation in this case is not foreclosed by operation of the doctrine of collateral estoppel because all four elements required under Indiana law have not been established.

## B. The Merits of the Claim

Professor Tribe documents the origins of the legal analysis of the tax immunity issue to *M'Culloch v. State of Maryland*, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819). In that foundational decision, the United States Supreme Court held that the Supremacy Clause of the Constitution prohibits a state from imposing a tax on bank notes issued by a branch of a bank chartered by the United States. Applying the principle that a government may not tax or otherwise control those whom it does not represent, the Supreme Court held that a state could not tax a federal instrumentality which Congress controlled for the benefit of all its citizens—both those within and without the State of Maryland. According to Professor Tribe, *M'Culloch*, and the later decision of *Osborn v. Bank of U.S.*, 9 Wheat. 738, 22 U.S. 738, 6 L.Ed. 204 (1824), establish the principle that if Congress does not authorize state taxation or regulation of federal instrumentalities, the *possibility of interference* with substantive federal policy is sufficient to raise a presumption of immunity from state regulations directed at the federal government. Continuing his analysis, Professor Tribe points out that the *possibility of interference* with substantive federal policy is not a basis to confer complete immunity from state law on someone who simply is an *agent* of the federal government. 89 Harv.L.Rev 682, 701.

■ Professor Tribe suggests that when the issue of state taxation arises, a rule of "legal incidence" must be applied. This rule, according to Professor Tribe, goes like this:

> The supremacy clause implies that, absent congressional consent, no state may (1) impose upon the United States or its instrumentalities an obligation to pay any tax; or (2) make any property interest owned by the United States or its instrumentalities subject to seizure or forced sale in order to satisfy a state tax liability.

89 Harv.L.Rev. at *704 (footnotes omitted). The formulation of such a rule seems consistent to us with other authoritative legal principles.

Returning to the case at bar, Clark County has not assessed its tax directly against the United States in the sense that it has not directed the tax bills to be sent to the United States. Rather, the tax has been assessed against an entity which, under a contractual agreement with the United States, had acquired the rights to deal with federal property. Hear how Professor Tribe addresses such a situation:

> Where state or local taxes are assessed against the user of federal property, the Court has escaped the Kern-Limerick twist. The cases find no implied immunity unless state law purports to hold the United States or its instrumentalities liable for the tax, or attempts to make federal property subject to a lien in the event of nonpayment. This is so whether the tax is denominated by the state as one on the privilege of using the property or as one on the property itself; even if the tax is measured by the value of the federal property; and even if the government has agreed to reimburse the user for paying the tax. In all these cases, unless the state deliberately precipitates a federal-state confrontation by insisting that the United States or its instrumentalities be answerable for the tax, the

underlying theory must be that only affirmative congressional action should be sufficient to strip the state of power to collect nondiscriminatory taxes from third parties.

89 Harv.L.Rev. 682, *708–09 (footnotes omitted).

■ Our own reading of the case law on this issue jibes with Professor Tribe's interpretation and the Order Denying Clark County's Motion to Dismiss previously entered. For emphasis, we state again that the United States Supreme Court has concluded that "Government-owned property, to the full extent of the Government's interest therein, is immune from taxation, either as against the Government itself or as against one who holds it as bailee." *U.S. v. Allegheny County, Pa.*, 322 U.S. 174, 189, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). Reserving at that time the question of whether a private bailee could be constitutionally taxed for its "right of possession or use" of government property, the Supreme Court held that a locality's tax on government property itself, and not on the privilege of using or possessing it, was invalid, whether it was imposed upon the United States or on its bailee. *Id.* at 185–86, 64 S.Ct. 908.

■ Since the holding in *Allegheny County,* the Supreme Court has reached the issue it there explicitly reserved, holding that a tax imposed upon a private citizen's use or possession of government property is not a tax on the government or its property and is therefore constitutional. In *U.S. v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), the Supreme Court held that the United States' immunity from state taxes is appropriate only "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the government that the two cannot realistically be viewed as separate entities, at least

insofar as the activity being taxed is concerned." *Id.* at 735, 102 S.Ct. 1373. It is "constitutionally irrelevant" whether the tax has an "effect" on the United States, if the government "shoulders the entire economic burden of the levy," or if it "reimburse[s] all the contractor's expenditures." *U.S. v. California,* 507 U.S. 746, 753, 113 S.Ct. 1784, 123 L.Ed.2d 528 (1993) (quoting *New Mexico,* 455 U.S. at 734, 102 S.Ct. 1373). Governmental tax immunity bars only those taxes that are imposed "directly on one sovereign by the other or that discriminate against a sovereign or those with whom it deals." *Jefferson County, Ala. v. Acker,* 527 U.S. 423, 436, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) (quoting *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 811, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)).

■ Thus, a locality may constitutionally impose a use tax on a private citizen or corporation utilizing or possessing government property in connection with the private citizen's or corporation's own commercial activities, regardless of whether those commercial activities arise out of a contractual relationship with the government. *See New Mexico,* 455 U.S. at 733, 102 S.Ct. 1373; *City of Detroit v. Murray Corp.,* 355 U.S. 489, 493, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958); *U.S. v. Muskegon Tp.,* 355 U.S. 484, 486, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958). A state or locality may also constitutionally tax private lessees of tax exempt property (including property that is owned by the government) which is used in a business conducted for profit, even if the leasehold interest is calculated for purpose of the tax by measuring the full value of the property. *See U.S. v. City of Detroit,* 355 U.S. 466, 469–70, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958).

Applying these principles, we note four areas of factual inquiry that require resolution in the case at bar:

(1) Does Clark County, by virtue of IND. CODE § 6–1.1–10–37, seek to hold the United States liable for the tax?

(2) Does Clark County, by virtue of IND. CODE § 6–1.1–10–37, seek to hold an instrumentality of the United States liable for the tax?

(3) Does Clark County, by virtue of IND. CODE § 6–1.1–10–37, attempt to make federal property subject to a lien in the event of non-payment of the tax?

If the answer to any one of these three queries is "yes," then the tax is unconstitutional. If the answer to all three of these inquiries is "no," then a fourth inquiry must be answered, which is:

(4) Did ICI act as a "user" or "possessor" of government property with respect to vacant buildings at the Plant?

We discuss each issue below *seriatim:*

**Issue 1: Did Clark County assess the taxes directly against the United States?**

Our review of the record establishes clearly that the taxes assessed in this case were assessed directly against ICI. We do not perceive any factual dispute between the parties in this regard. So, the answer to this question is "No."

**Issue 2: Did Clark County assess the taxes against an instrumentality of the United States?**

 Case law defines "instrumentality" of the United States as an entity which is so closely connected with the United States that the two cannot realistically be viewed as separate entities. *New Mexico,* 455 U.S. at 720, 102 S.Ct. 1373. The undisputed facts show that there simply is nothing more than a contractual relationship between the United States and ICI, as further evidenced from the following subsidiary facts:

1. From 1993 until March 1999, the relationship between the Army and ICI was governed by several contractual documents, including a Facilities Use Contract, No. DAAA09–92–E–0011, dated February 17, 1993 ("the Contract"), and the March 1993 ARMS Contract ("ARMS Contract"), Ex. 2 of the Declaration of Douglas A. Borgeson, filed May 25, 2000 ("Borgeson Dec."); Modification P00116 to the ARMS Contract dated June 19, 1996 ("Mod.P00116"), Tax 7 of App.; Modification P00152 to the ARMS Contract dated July 11, 1997 ("Mod.P00152"), Tab 11 of App.; Modification P00161 to the ARMS Contract dated January 16, 1998 ("Mod.P00161"), Tab 14 of App.; Modification P00060 to the ARMS Contract dated February 15, 1995 ("Mod.P00060"), Tab 2 of App.; Modification P00069 to the ARMS Contract dated March 31, 1995 ("Mod.P00069"), Tab 4 of App.; Dec. 8, 1997 letter to ICI from McKinnis, Tab 12 of App. (Borgeson Dec., ¶ 5, Ex. 1; Burgin Dec., ¶ 4). (Plaintiff's Statement of Material Facts, ¶ 13).

2. By contract, the United States turned over to ICI responsibility for the following:

DESCRIPTION OF FACILITIES

The facilities, hereinafter referred to as the "Plant", comprise a certain Government-owned industrial installation (or portions thereof), designated as the Indiana Army Ammunition Plant, located in the vicinity of Charlestown, Indiana, and constitute a plant for the production and reblending of explosives, propellants and related products. The

Plant consists of all buildings, lines, laboratory and shop facilities, first aid stations or hospitals, utilities and all appurtenances thereto, together with equipment, including without limitation, transportation and maintenance equipment, necessary or appropriate in or about a plant of the type described.

(Schedule to Contract DAAA09–86–Z–0001 (referenced in Facility Use Contract at 2), Tab 40 of Clark County's Appendix ("App.").) (Defendant's Statement of Additional Material Facts, ¶ 54).

3. A second contract between the Army and ICI, DAAA09–93–E–0001 ("the CTR"), consisting of a basic contract and a series of 197 contract modifications, provided funding for achieving specific ARMS objectives during that time. (Borgeson Dec., ¶ 5, Ex. 2; Burgin Dec., ¶ 4.) (Plaintiff's Statement of Material Facts, ¶ 16).

4. Under the ARMS program, the Contract, and the CTR, ICI was given a mission of securing commercial enterprises to utilize the buildings located at the Plant. (Borgeson Dec., ¶ 5; Burgin Dec., ¶ 4.) (Id. at ¶ 17).

5. ICI advertised that the entire facility at INAAP was available for commercial use. (Guthrie Aff., ¶¶ 8–9). (Defendant's Statement of Additional Material Facts, ¶ 63).

6. ICI had the authority to rent out almost all of INAAP to private tenants, subject to government approval. (Burgin, Indiana State Board of Tax Commissioners October 21, 1998 Hearing Transcript at 109–10, Tab 26 of App.; Funk Dep. at 80; Facility One Newsletter, Summer 1997, at 4, Tab 9 of App.) (Id. at ¶ 65).

7. ICI was the only entity that had the authority to negotiate with commercial tenants at INAAP and to enter into agreements with them ("Facility Use Agreements") for the use of buildings at INAAP. (Burgin, Apr. 1998 Trans. at 71; Borgeson Dep. at 17, Tab 35 of App.) (Id. at ¶ 66).

8. ICI was referred to as the "landlord" at INAAP in two reports. (ICI's Strategic Business Plan at 42, Tab 5 of App.; see United States GAO, Report to Congress on Cost to Maintain Inactive Ammunition Plants and Closed Bases Could be Reduced ("GAO Report") at 3, Tab 8 of App.) (Id. at ¶ 67).

9. Neither the United States government, the United States Army, nor the Industrial Operations Command ("IOC") was a party to the Facility Use Agreements that ICI entered into with tenants at INAAP. (Borgeson Dep. at 17; McKinnis Dep. at 108–09; Burgin, Apr. 1998 Trans. at 72.) (Id. at ¶ 68).

10. When ICI would find a suitable commercial enterprise, ICI would seek express authorization from the Army to be able to enter into a Facilities Use Agreement with the commercial enterprise. (Borgeson Dec., ¶ 6; Burgin Dec., ¶ 5.) (Plaintiff's Statement of Material Facts, ¶ 18).

11. ICI's proposal for Army approval had to include the consideration to be paid by the commercial occupant and the use the commercial occupant intended to make of the Army's building and had to state any alterations or renovations which the occupant would require.

(Borgeson Dec., ¶ 6; Burgin Dec., ¶ 5.) (*Id.* at ¶ 19).

12. Authorization, when and if given, was granted by letter. (Borgeson Dec., ¶ 6, Ex. 3.) (*Id.* at ¶ 20).

13. The Army withheld approval for ICI to enter into a Facilities Use Agreement with a commercial enterprise in approximately one-quarter to one-third of the proposals advanced by ICI. (Borgeson Dec., ¶ 6.) (*Id.* at ¶ 21).

14. The Army withheld approval for a variety of reasons: the amount of consideration, the character of the proposed use, the need of the Army for the building, environmental risks, etc. (Borgeson Dec., ¶ 6; Burgin Dec., ¶ 5.) (*Id.* at ¶ 22).

15. If the Army approved the proposed use of the building, ICI would then enter into a Facilities Use Agreement with the commercial occupant. (Borgeson Dec., ¶ 7; Burgin Dec., ¶ 6.) (*Id.* at ¶ 23).

16. Under the Facilities Use Agreement, the commercial occupant would receive a subcontract to use certain buildings and equipment at the Plant for certain purposes for a term of months or years in exchange for consideration. (Borgeson Dec., ¶ 7; Burgin Dec., ¶ 6.) (*Id.* at ¶ 24).

17. ICI had no authority to sell, alter, renovate or remove any Plant building or property without the express permission of the Army. (Borgeson Dec., ¶ 8; Burgin Dec., ¶ 7.) (*Id.* at ¶ 27).

18. The Army had the right to terminate ICI as the base contractor upon 180 days notice. (*See* Contract, Part I, Section H–16.1(c).) (Burgin Dec., ¶ 7.) (*Id.* at ¶ 30).

19. ICI's goal in operating INAAP pursuant to the Facility Use Contract and the ARMS Contract was to make a profit. (Burgin, Apr. 1998 Trans. at 52–53; Burgin, Aug. 1999 Trans. at 42.) (Defendant's Statement of Additional Material Facts, ¶ 73).

20. ICI made a profit at INAAP each year that it operated INAAP. (Funk Dep. at 31; Burgin, Aug. 1999 Trans at 91.) (*Id.* at ¶ 74).

21. In 1995, ICI received incentive payments totaling $914,675 from the United States government with respect to INAAP. (Mar. 21, 1995 letter to ICI from IOC, Tab 3 of App.; Dec. 18, 1995 letter to ICI from IOC, Tab 6 of App.; Modification P00060 to the ARMS Contract, Tab 2 of App.; Modification P00069 to the ARMS Contract, Tab 4 of App.) (*Id.* at ¶ 76).

22. The incentive payments ICI received for INAAP for 1996 and 1997 totaled approximately $800,000. (Borgeson Dep. at 67–71.) (*Id.* at ¶ 79).

23. ICI received ARMS funds for marketing and promoting INAAP, which ICI did not have to pay back. In 1997, for example, the United States government provided approximately $350,000 to ICI for marketing activities at INAAP. (Funk Dep. at 113; Memorandum of Discussions, July 9, 1997, Tab 10 of App.; McKinnis Dep. at 49; Burgin Dep. at 57–59.) (*Id.* at ¶ 80).

In light of these facts, we conclude that there was a contractual relationship between the United States and ICI and that ICI was not an "instrumentality" of the

United States. Accordingly, the answer to issue 2 is "No."

### Issue 3: Does Clark County seek to make federal property subject to a lien in the event of non-payment of the tax?

Exhibit 22 in the "Appendix of Evidentiary Materials in Support of Clark County's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment" (Docket Item 49) contains a notice under which Clark County advised ICI that particular buildings would be sold at a tax sale. From this notice, it appears that Clark County has at least threatened to make specific buildings at the facility subject to some type of judicial lien that would attach by virtue of a tax sale. To the extent that Clark County sought to make vacant buildings, which are owned by the United States, subject to a judicial sale, Clark County apparently attempted to make federal property subject to a lien recognized by Indiana law.

However, other evidence of record indicates that when confronted with resistance to inclusion in the tax sale, Clark County forewent any further steps to subject federal property to a judicial lien. The undisputed factual findings tendered by the parties provide as follows:

24. On two occasions—in September 1998 and September 1999—the Clark County Treasurer issued notices to ICI listing for tax sale Plant buildings owned by the Army. (McGhee Dec., ¶¶ 2–3.) (Plaintiff's Statement of Material Facts, ¶ 50).

25. In each case, Clark County removed the buildings from the tax sale after being contacted by the

Army. (McGhee Dec., ¶¶ 2–3.) (*Id.* at ¶ 51).

On this basis, we conclude that Clark County has not attempted to complete any process by which federal property would be made subject to a judicial lien. Because ultimately Clark County has withdrawn its efforts to make the buildings subject to a tax sale, it has not attempted in any material way to make property of the United States subject to a judicial lien. The answer, therefore, to the third query is "No."

### Issue 4: Did ICI act as a "user" or "possessor" of government property with respect to the vacant buildings at the Plant?

The facts which apply to the resolution of this issue include Facts 1 through 23, delineated above as part of our ruling respecting Issue Two, to which we add the following factual findings [4]:

26. The Plant is a facility in Charlestown, Indiana, owned by the United States and operated under the jurisdiction of the United States Army's Operations Support Command ("OSC") (formerly the Industrial Operations Command ("IOC") (hereafter "the Army")), based in Rock Island, Illinois. (Borgeson Dec., ¶¶ 1–2.) (Plaintiff's Statement of Material Facts, ¶ 1).

27. The Plant consists of 9,780 acres. (Borgeson Dec., ¶ 2.) (*Id.* at ¶ 2).

28. The Plant also contains 1,633 real property structures, including 176 storage igloos or magazines. (Huss Dec., ¶ 2). (*Id.* at ¶ 3).

29. Some but not all of these structures were designed and originally utilized for the manufacture and stor-

---

**4.** We acknowledge that certain of these itemized facts are repeats of earlier references in

this decision. Nonetheless, we include them here for sake of clarity and cogency.

age of high explosives. (Borgeson Dec., ¶ 2.) (*Id.* at ¶ 4).

30. From 1940 to 1992, the Army arranged for the manufacture of military propellants at the Plant by civilian contractors. (Borgeson Dec., ¶ 3.) (*Id.* at ¶ 5).

31. In 1972, ICI became the contractor operator of the Plant. (Borgeson Dec., ¶ 3; Burgin Dec., ¶ 2.) (*Id.* at ¶ 6).

32. From 1972 to 1992, ICI's main responsibility at the Plant was to manufacture military propellants and propelling charges under the direction and control of the Army. (Burgin Dec., ¶ 2.) (*Id.* at ¶ 7).

33. In 1992, the Plant was deactivated and ceased manufacture of propelling charges. (Huss Dec., ¶ 2; Burgin Dec., ¶ 3.) (*Id.* at ¶ 10).

34. Also, in 1992, Congress passed the Armament Retooling and Manufacturing Support Act of 1992, P.L. No. 102–484 ("AMS"), under which Congress granted the Army the authority to convert unused government-owned ammunition plants, or parts thereof, to civilian use. (Borgeson Dec., ¶¶ 1, 4.) (*Id.* at ¶ 11).

35. There were nine specific purposes behind ARMS: to encourage the commercial use of government-owned contractor-operated ("GOCO") facilities, to enable small business and small disadvantaged business use of GOCOs, to reduce the adverse effects of downsizing on communities, to re-employ and retain skilled workers, to attain economic stability in depressed areas, to maintain the workforce skills necessary for national security purposes, to provide a model for future defense conversion programs, to allow GOCOs to be responsive in free market competition, and to relocate off-shore production to the United States. (Borgeson Dec., ¶ 4). (*Id.* at ¶ 12).

36. The Army also had the right to evict the commercial occupant at any time with sufficient notice. (*See* Contract, Part II, Section I.34, incorporating FAR 52.245–11(k)(2).) (Borgeson Dec., ¶ 8; *see also* FAR 52.245–11(k)(2)). (*Id.* at ¶ 31).

37. In addition, the Army's approval of a proposed use of one of its buildings permitted ICI or its subcontractor to use the building only for a limited time and only for a specific purpose. (Borgeson Dec., ¶ 9; Burgin Dec., ¶ 8.) (*Id.* at ¶ 32).

38. ICI needed to obtain new Army approval for a commercial occupant to change the character of a building's use. (Borgeson Dec., ¶ 9; Burgin Dec., ¶ 8.) (*Id.* at ¶ 33).

39. Various modifications to the CTR authorized disbursement of ARMS funds to modify various buildings for use by commercial occupants and authorized incentive payments to ICI based on attainment of ARMS goals. (Borgeson Dec., ¶ 11; Burgin Dec., ¶ 10.) (*Id.* at ¶ 35).

40. ICI received compensation in one of several ways, including: (1) ICI retained sufficient occupant revenues to cover the cost of statements of work required by the Army and received a negotiated percentage of the net revenue received from occupants in excess of that cost, the percentage being based on the degree of attainment

of ARMS goals and the degree of financial risk assumed by ICI; (2) for 1994–1997, ICI received performance incentives related to the numbers and types of commercial occupants it brought to the Plant (*see* Modification Nos. 60, 69, 126 and 155 to the CTR); (3) on occasion, ICI was directed to dispose of government-owned personal property and received a fee for disposal services based on a percentage of the proceeds from the sale (Borgeson Dec., ¶ 11; Burgin Dec., ¶ 10.); (4) the United States provided $350,000 to ICI for marketing at INAAP (McKinnis Dep. at 128–30, 133–34, 147–50); and (5) the United States authorized $88,000 of ARMS money to be paid to ICI to fund ICI's legal fees for resisting taxation at INAAP (January 22, 1998 letter to McKinnis from Saunders, Tab 16 of App.; May 1, 1998 letter to Huss from Reese, Tab 21 of App.; Mods. 60 and 69 (incentives not restricted to number and types of buildings rented)). (*Id.* at ¶ 36; Defendant's Response to Plaintiff's Statement of Material Facts, ¶ 36).

41. Subsequent to 1993, approximately 200 buildings and 100 storage igloos or magazines have been utilized by various commercial enterprises pursuant to Facilities Use Agreements to which ICI was a party. (Borgeson Dec., ¶ 12; Huss Dec., ¶ 3; Burgin Dec., ¶ 11.) (Plaintiff's Statement of Material Facts, ¶ 37).

42. ICI has occupied a portion of one building, B–703, as administrative offices without payment of compensation to the Army for the use of the office space. (Borgeson Dec., ¶ 12; Burgin Dec., ¶ 11.) (*Id.* at ¶ 38).

43. Since 1993, 10–12 buildings at the Plant have been used by the Army for the storage of Army property. (Huss Dec., ¶ 4.) (*Id.* at ¶ 39).

44. The remaining approximately 1,300 real property structures have been vacant from the time of the Plant's deactivation in 1992 to the present time. (Huss Dec., ¶ 5.) (*Id.* at ¶ 40).

45. Under the Contract, ICI was responsible for security, provision and maintenance of utilities, and fire protection at the Plant. (Burgin Dec., ¶ 12.) (*Id.* at ¶ 43).

46. Other than its authority to market and offer buildings to prospective commercial users, ICI has had no responsibility for scope of work with respect to these vacant buildings nor was ICI ever authorized to sublicense these buildings to commercial users. (Borgeson Dec., ¶ 13; Huss Dec. ¶ 5; Burgin Dec., ¶ 11.) (*Id.* at ¶ 44).

47. The Army retains the right to enter any structure at the Plant, including the vacant structures, and has, on occasion since 1992, entered some vacant structures to conduct spot checks of the structures or Army property contained therein. (Huss Dec., ¶ 6.) (*Id.* at ¶ 45).

48. In 1996, the Clark County, Indiana Assessor issued tax assessments on most of the Plant's buildings for the 1995 assessment year. (Burgin Dec., ¶ 13.) (*Id.* at ¶ 47).

49. With the exception of about four duplicate assessments issued to both commercial occupants under Facilities Use Agreements and ICI, all assessments were originally issued to ICI as the "user" or "pos-

sessor" of the buildings assessed. (Burgin Dec., ¶ 13.) (*Id.* at ¶ 48).

50. Most of the assessed buildings were totally vacant, in many cases unusable without substantial renovations. (Burgin Dec., ¶ 13.) (*Id.* at ¶ 49).

51. In October 1997, the United States "excessed" INAAP (i.e., the government decided it had no future military use for INAAP). (McKinnis Dep. at 70–71.) (Defendant's Statement of Additional Material Facts, ¶ 82).

52. There has been no military presence at INAAP since 1995 or 1996, except that a civilian contractor's representative, Mr. Huss, remains on the site. (Burgin, Apr. 1998 Trans. at 64; Guthrie Aff., ¶ 3.) (*Id.* at ¶ 83).

■■■ From these facts, we conclude that, though ICI had the authority to advertise the availability of buildings at the Plant, it did not possess or use those buildings until such time as another entity began use of the particular facility. The Facilities Use Agreement cannot be construed as a lease of the entire plant property under which ICI was authorized to sublease any part of the facility. Rather, the Facilities Use Agreement is more properly characterized as an agreement under which ICI was given the rights to market the facilities at the Plant, and was paid to maintain the Plant when and as directed by the Army. ICI does not have a leasehold interest in the Plant itself, nor in any structure upon the Plant until such time as a third party takes possession of a particular structure upon the property. At such a time, ICI assumes the role of leasing agent and assumes the responsibility for use or possession of the particular facility. Therefore, unless and until such time as there is a contract entered into between ICI and a third party to make use of a particular facility at the Plant, ICI does not use or possess real property at the Plant.

## C. Constitutionality of IND.CODE § 6–1.1–10.37(b), as Applied

The following provision of Indiana law is at issue:

**Indiana Code § 6–1.1–10–37. Leasing of exempt property.**—(a) This section does not apply to the lease of a dwelling unit within a public housing project by the tenant of that dwelling unit.

(b) If real property that is exempt from taxation is leased to another whose property is not exempt and the leasing of the real property does not make it taxable, the leasehold estate and the appurtenances to the leasehold estate shall be assessed and taxed as if they were real property owned by the lessee or his assignee.

(c) If personal property that is exempt from taxation is leased to another whose property is not exempt and the leasing of the personal property does not make it taxable, the leased personal property shall be assessed and taxed as if it were personal property owned by the lessee or his assignee.

Given our rulings that ICI did not have a leasehold interest in the real property at the Plant, Clark County's tax levy on ICI pursuant to the above cited authority amounted to a unconstitutional tax on federal property, in violation of the Supremacy Clause of the United States Constitution. As noted earlier in our Order Denying Clark County's Motion to Dismiss, the core holding of *U.S. v. Allegheny County, Pa.,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944), abrogated by *U.S. v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958), that a tax

on government property is unconstitutional if imposed on the property itself and not on a private citizen's privilege of using or possessing it, whether the tax is imposed on the government or the bailee of the property, remains valid.

The case at bar is distinguishable from those cases decided by the Supreme Court subsequent to its opinion in *Allegheny County,* wherein the Court narrowed and clarified the circumstances in which a state tax offends the Supremacy Clause of the United States Constitution. *See U.S. v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958) (upholding a Michigan tax on a lessee's actual use of a government-owned industrial plant, even though the tax amount was based on the value of the real property being used); *U.S. v. Muskegon Tp.,* 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958) (upholding the same Michigan tax levied on a private entity actually using government-owned property through a permit); and *City of Detroit v. Murray Corp.,* 355 U.S. 489, 78 S.Ct. 486, 2 L.Ed.2d 460 (1958) (upholding a personal property tax imposed on a private contractor in possession of government property). In contrast, our case mirrors the holding in *U.S. v. State of Colorado,* 627 F.2d 217 (10th Cir.1980). There, the United States brought an action seeking a declaratory judgment that a state-imposed tax on a government contractor in charge of the day-to-day operations at a facility to develop and produce nuclear weapons, pursuant to a government management contract, infringed on the immunity of the United States from state and local taxation in violation of the Supremacy Clause of the United States Constitution. The Tenth Circuit concluded that the contract between the United States and the private contractor did not allow the contractor any use of the property outside that which was specifically delineated in the contract. Therefore, the

tax was not a tax on any "use" of the property, but was an unconstitutional "ad valorem general property tax on property owned by the United States." *Id.* at 220. The same conclusion pertains here.

When the constitutionality of a statute is attacked, the first conclusion a court must reach is whether the statute is unconstitutional "as applied," a term with constitutional significance. *See generally, Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). In order to make this determination, the Court reviews the statute in light of its impact on a particular case. Next, the Court considers whether the statute is unconstitutional "on its face," which means that the statute is "invalid *in toto*—and therefore incapable of any valid application." *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (citing *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)). We have established from our analysis that IND.CODE § 6–1.1–10–37 is unconstitutional "as applied" in the instant matter. The parties have not explicitly requested that we address whether the section is unconstitutional "on its face," and we will not endeavor to make such a determination on our own.

### III. Conclusion

For or all the reasons explicated above, the United States' Motion for Summary Judgment is **GRANTED** and Clark County's Motion for Summary Judgment is **DENIED.** Also, the application of IND.CODE § 6–1.1–10–37(b) is invalid as applied. The Court does not reach the issue of the facial constitutionality of that statute.